IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

QINGHUA ZHANG, and
STEVEN CRAIG HEILAND,

                      Plaintiffs,

        vs.                                  Case No. 19-4073-SAC

FEDERAL HOME LOAN
BANK OF TOPEKA,

                      Defendant.

MEMORANDUM AND ORDER

       The plaintiffs, Qinghua Zhang ("Zhang") and Steven Craig Heiland

("Heiland"), are former employees of Federal Home Loan Bank of Topeka ("FHLB").

They bring claims of race-based discrimination and retaliation in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and state

common-law retaliatory termination in violation of public policy. FHLB moves for

summary judgment (ECF# 90), and the parties have fully briefed the motion.

       Both plaintiffs worked for FHLB for over a decade. An Asian-American

male, Zhang began working on January 16, 2007. When he was terminated on March

5, 2019, he held the position of Director of Quantitative Analysis. A white male,

Heiland began working on May 6, 1999. When he was terminated on April 29, 2019, he

held the position of Director of Market Risk Operations.

       The employment problems at issue seem to have escalated from the

following. When Peg Schultz ("Schultz"), a Caucasian woman on working on Zhang's

team, retired in September of 2018, she stated in her exit interview with Human

Resources ("HR") that she believed Zhang had discriminated against women and

harbored a discriminatory attitude toward them. In response, HR interviewed a Caucasian woman working in the same department but not on Zhang's team. HR then verbally counseled Zhang in November of 2018. After this disciplinary action, the tension between the plaintiffs and FHLB's management and HR escalated.

**SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding the motion, the court's role is "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court may grant summary judgment for lack of a genuine issue when the evidence is insufficient "for a jury to return a verdict," when "the evidence is merely colorable," or when the evidence "is not significantly probative." *Id*. It follows then that a genuine issue for trial exists when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden is met "by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671. The burden then shifts to the nonmovant to "go beyond the pleadings and set forth

specific facts that would be admissible in evidence in the event of trial from which a rational fact finder could find for the nonmovant." *Id.* (internal quotation marks and citations omitted). Such facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

The court applies this standard drawing all inferences arising from the record in the nonmovant's favor. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). The court does not make credibility determinations or weigh the evidence; these are jury functions. *Id.* at 1216. The Tenth Circuit has counseled the following for summary judgment proceedings in employment discrimination cases:

> [I]n the context of employment discrimination, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). Many of the highly fact-sensitive determinations involved in these cases "are best left for trial and are within the province of the jury." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he inquiry [at summary judgment is] whether the evidence presents a sufficient disagreement to require submission to a jury...."). Consequently, "in this Circuit . . . an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct]." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th Cir. 1998) (Tacha, J., concurring in part); *see Randle*, 69 F.3d at 452 ("[I]f . . . inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.").

*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1220-21 (10th Cir. 2015).

**CLAIMS**

In the pretrial order, Zhang states his legal claim of <u>Title VII race discrimination</u> as FHLB taking "materially adverse job actions against him because of his race." ECF# 89, p. 7.  For his factual contentions, Zhang asserts Michael Surface ("Surface"), supervisor for both him and Heiland, received repeated complaints in

2018 about Schultz treating Asian-minority employees in the Market Risk Analysis ("MRA") Department poorly. Surface counseled Schultz about her behavior but took no further disciplinary action against her. Nor did FHLB investigate these allegations of race discrimination against Schultz. It is also contended the plaintiffs complained to Surface that Cathy Parcaro was promoted over an Asian employee who had been promised a promotion. This discriminatory action was reported to HR, but it was not investigated and did not result in any disciplinary action. It is further contended that when Schultz complained of Zhang discriminating against women, HR failed to speak to him, to investigate prior complaints against Schultz, and to interview other witnesses before disciplining him.

The pretrial order reflects that Zhang contends he complained to Surface and HR of their race discrimination in the handling and investigation of Schultz's allegations against him and in Surface's threatening conduct toward Asians and tolerance of Schultz's actions toward Asians. Finally, Zhang contends he complained when Cathy Parcaro was recognized for work that had been accomplished by Zhang's Asian team, but HR did not fairly investigate his complaints or take disciplinary action. While including all these incidents as discrimination, the pretrial order is not clear on what Zhang is asserting to be an adverse employment action for this claim. Based on the parties' summary judgment briefing on this claim, the court understands Zhang's termination to be the only adverse employment action. The court, therefore, understands these factual contentions to be evidence in support of his claim of racially discriminatory employment termination.

Zhang summarizes his <u>Title VII retaliation claim</u> as FHLB taking materially adverse actions against him in retaliation for opposing discrimination against Asian minority employees. Zhang contends FHLB terminated his "employment in retaliation for his complaints of race discrimination." ECF# 89, p. 5.

Zhang summarizes his <u>state-law claim of retaliatory discharge</u> for whistle-blowing activities as FHLB terminated him in retaliation for reporting that FHLB had violated its Anti-Fraud Policy, the Safety and Soundness Act, and Sarbanes-Oxley Act. Zhang contends he reported to Surface in December of 2018 "a modeling issue that would generate false reports" and to Enterprise Risk Management ("ERM") Department "suspicious model validation reports." ECF# 89, p. 4. Zhang also contends that in January of 2019 he reported to Surface "a serious modeling issue in the stress-testing process," and that in March of 2019 he reported to Surface and Schlossman "serious concerns about the PolyPath income simulation validation process." *Id.* He contends FHLB did not address his concerns about false reporting but terminated him in retaliation.

Heiland summarizes in the pretrial order his <u>Title VII claim of retaliation</u> as FHLB taking materially adverse actions against him in retaliation for witnessing and opposing upper management's discrimination of Asian employees. He also contends in the pretrial order that in November and December of 2018 Zhang listed him as a witness to the discriminatory conduct of Schultz and Surface. Heiland also contends that upon Zhang's termination on March 5, 2019, he told Surface that he opposed the termination as discriminatory and retaliatory. "On April 12, 2019, the day after Zhang identified Heiland as witness and opponent of the action, FHLBank placed Heiland on

5

administrative leave, and Heiland notified FHLBank's HR and Legal Department that he opposed the discrimination and retaliation Zhang had been subjected to and he supported the whistleblower claims concerning false reports." ECF# 89, p. 5.

Heiland summarizes his state-law claim of retaliatory discharge for whistle-blowing activities as his termination for reporting that FHLB had violated its Anti-Fraud Policy, the Safety and Soundness Act, and Sarbanes-Oxley Act. In the pretrial order, the contentions state that the "plaintiffs" reported the January 2019 modeling issue and the March 2019 serious concerns about the PolyPath income simulation validation process. The contentions also include that Heiland reported to Surface "a serious false report about pricing mortgage investments." *Id.* at p. 4. He too contends FHLB did not address his concerns about false reporting but terminated him in retaliation.

Both plaintiffs also contend FHLB offered them severance agreements that violated FHLB's own written severance policy and Section 21F-17(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78u-6).

**FACTS**

The court finds the following statement of facts to be uncontroverted after considering the parties' objections and citations and after closely reviewing the actual exhibits submitted. The court will explain its findings and its rulings on any objections only when they are central to the summary judgment decision. In all other instances, the rulings and reasons should be evident from the statement's particular wording and inclusion. It should be apparent that the court was careful to rely on what submitted exhibits show.

The court is also critical of the parties' efforts at controverting the other side's statement of facts. This part of summary judgment briefing is not a free-for-all opportunity to argue or dispute inferences or conclusions or to do the same under the pretense of evidentiary objections for relevance and materiality. Facts are facts. They should be stated simply and specifically within their relevant contexts fully supported by citations from the record. All other efforts are distracting and contravene the spirit of the summary judgment process.

As the Director of Quantitative Analysis in the Market Risk Analysis ("MRA") Department, Zhang directed the highly technical and related support activities for operation processes that generated analyses and reporting of FHLB's market risk measurement metrics. Heiland worked as the Director of Market Risk Operations. Part of their duties as directors was supervising other employees. Both plaintiffs had been promoted to Assistant Vice-President positions at FHLB approximately a year before their terminations. Both plaintiffs were directly supervised by Surface. Amanda Kiefer ("Kiefer") is the HR Director at FHLB. Both plaintiffs received training on the following FHLB's policies:  Anti-Fraud, Anti-Money Laundering, and Anti-Harassment and Equal Employment.

In his deposition, Heiland said he exchanged many emails with Zhang that were sarcastic and speculative about certain female employees, because they were "trying to just follow" what was happening with their attendance and work issues and with Surface's final oversight of them. ECF# 91-2, p. 26-27. FHLB's statement of facts includes excerpts and summaries of certain emails discussed in Heiland's deposition, and these emails and others are part of the summary judgment

record. The court finds that FHLB's statements about those emails are uncontroverted to the extent that those excerpts can be found in the emails. The inferences to be drawn from them is uncertain, if not disputed, because the emails lack context and background and involve credibility determinations like that suggested in defendant's statements of fact ¶¶ 38 and 41. Similarly, the court does not accept as uncontroverted the defendant's characterization of Heiland's testimony about his problem with FHLB's use of the diversity and inclusion initiatives to promote women. Heiland's full testimony on these topics could be read and understood differently. This also involves credibility determinations not suited for summary judgment. In short, the court does not find the defendant's characterization of the plaintiffs' emails as "inappropriate behavior toward females" to be a matter settled by this summary judgment record. This is also the case with the defendant's effort to construe Heiland's testimony to say that he and Zhang were always treated the same despite their different races. The context for Heiland's testimony is too uncertain to be used as the defendant wants for summary judgment.

The defendant's cited evidence does not support its statement at ¶ 46 that during his employment "Heiland never reported to FHLB that he witnessed any violation of the Anti-Harassment policy or of witnessing racial discrimination." (ECF# 99, FHLB Reply, pp. 15-16). In the cited testimony, Heiland was not asked about reporting to "FHLB" but to "HRI." ECF# 91-2, pp. 30-31. This was one of the distinctions that Heiland was careful to make in his deposition testimony. *Id.* Thus, this statement has been controverted.

Peg Schultz was an employee in the MRA Department under Zhang's supervision. He thought she was mean and rude. Surface testified that across the MRA Department, Schultz's strong personality was not received positively by others. When Schultz retired, she said some things during her exit interview that led to a second interview on September 13, 2018, with HR Director Kiefer. Kiefer testified that Schultz said she thought it important for the organization to know of Zhang's "sentiment" and how he treated his female employees. ECF# 91-3, p. 7. Kiefer also said Schultz shared that Zhang "devalued her work and contribution to the organization," that Zhang kept significant work from her, that Zhang had a pattern of giving better work to men, and that any time a woman was promoted Zhang would say "it's only because of diversity and inclusion." *Id.* at pp. 8, 11-12. Kiefer testified that during the interview Schultz had complaints only against Zhang. The court finds that the plaintiff's statement of fact ¶ 132 on what Schultz told Kiefer during the interview based on Zhang's affidavit lacks a foundation for admissibility.

After the interview with Schultz, Kiefer spoke with Cathy Pacaro, another woman working in the MRA Department. Pacaro told Kiefer that Zhang at times had undermined her and made discriminatory remarks toward her.

Surface testified that he did not personally "observe the complaints made by Peg Schultz against" Zhang. ECF# 98-7, p. 7. Kiefer testified she also spoke with Surface about Schultz's complaints against Zhang.

On November 14, 2018, FHLB issued a Verbal Counseling to Zhang based on the interviews of Schultz and Pacaro. No one spoke with Zhang about Schultz's exit interview allegations before he received this Verbal Counseling document. When

presented with the document, Zhang was told by Surface that his "career would be jeopardized" if he did not sign it. ECF# 98-2, ¶ 20. Zhang was not given the opportunity to respond when it was presented. The form reflects, however, that he signed the document on November 29, 2018, and that he attached five pages of his "defense to this verbal counseling." ECF# 91-4, p. 69.

The court does not accept as uncontroverted the defendant's characterization that Zhang's written defense "was entirely focused on" Schultz and her discriminatory treatment against other Asian-American coworkers. ECF# 99, p. 22. Zhang's written defense is dated November 20, 2018, and opens with these three paragraphs:

> I am very offended by a verbal counseling given to me on November 14, 2018. It was from nowhere and ready for me to sign. No any (sic) evidence was presented. A minority is disciplined solely based on slanders/libels from a white person. I, a minority, didn't receive fair treatment and respect. I am shocked and interpret it as race discrimination against me.
>
> Below you will find many instances of the white person's discriminations against minorities including me. Most of them were much more serious than the slanders/libels. I communicated most of those issues to my manager via emails. I have never seen any verbal counseling was (sic) given to the white person. I interpret it as race discrimination against minorities as well.
>
> It has created a hostile work environment so that the good progress of several critical and time sensitive projects I manage for the bank was slowed down. Honestly, I just want to do my job and help the bank succeed. Unfortunately, the white person just wants to attack me. I fought very hard for this chance to say something that all minorities on the team have wanted to say and haven't said for years. I hope there is no retaliation against any of us in the future.

ECF# 91-4, p. 70. Zhang's defense first alleges Schultz discriminated against minority coworkers by being particularly rude to them, interrupting their presentations, openly criticizing their work, claiming others' work as done by her, becoming jealous and retaliating against minority coworkers, and regularly engaging in insulting and

intimidating behavior. *Id.* at pp. 70-72. His defense also responds directly to the allegations saying that he speaks favorably and fairly of minorities and women who are promoted. He also accused Schultz of being "jealous of" his work performance and being unable to "tolerate a minority as her manager" and working to have him removed so she could get his job. *Id.* at p. 72. Zhang's defense also points to his role in denying Shultz's pre-retirement request for working remotely about which "[s]he was not happy for sure and retaliated against me." *Id.* His defense also responds that Schultz lied in saying she was not given challenging and substantive work. He noted that Surface made the final decisions on assignments and that the evidence regarding her actual assignments, licenses, and ownership of processes belie her allegations. He also noted:  "My team members are very excited about Peg's retirement. The productivity of the team has been improved greatly. We are doing just fine without her. Feel free to interview any of my team members." ECF# 91-4, p. 73. He concluded with several observations, including this:

> Whenever there are two side stories, one is from a white person and the other is from a minority. Most likely, the story from the white person is believed by the bank. The minority must work extremely hard to prove her/his story is true. This verbal counseling is a good example. Two standards are always there.

ECF# 91-4, p. 74.

Zhang admitted in his deposition that the Verbal Counseling was the main reason for complaining about Schultz **when** he did. The defendant's statement at ¶ 60 contains multiple propositions of fact with one or more of them effectively controverted by the plaintiff. Zhang does not controvert that he did not tell Schultz when she worked for him that he regarded her behavior as threatening, and that he

never directly reported her behavior to HR before November of 2018. Zhang represents having reported discrimination against Asians when he completed an anonymous bank employee survey in 2018.

In November of 2018, following the issuance of the Verbal Counseling, Zhang's employment was not terminated, his salary was not decreased, and he was not demoted. Zhang avers that following his complaints of discrimination and improper financial reporting from November 14, 2018 until March 5, 2019, Surface "increased scrutiny" of Zhang, "disregarded" Zhang's input on department issues, and "disregarded" his "concerns about hiring decisions." ECF# 98-2, ¶ 33. Surface testified that he became aware of Zhang's written defense, but that he was not involved in any investigation into it and does not know if an investigation was done. ECF# 98-7, pp. 7-8. Surface also said that after the Verbal Counseling and Zhang's written defense, his conversation about this issue with Zhang ended.

Kiefer testified that HR reviewed Zhang's written defense document and determined not to take further steps related to Schultz's behavior because Schultz was now retired, because Schultz worked for Zhang and "there was no racial discrimination" in that circumstance, and because there were no recent claims of discrimination. ECF# 91-3, p. 20. Surface testified that he had received complaints about Schultz's behavior during her employment but that he was unaware of any investigations into Schultz's behavior.

Kiefer did meet with Zhang on November 29, 2018, during which Zhang stated a claim of discrimination against Surface involving an interaction that happened in 2014. Zhang avers the discriminatory interaction arose from his

12

complaint to Surface about manipulating modeling assumptions and with Surface then

yelling and threatening Zhang. ECF# 98-2, ¶ 3. Zhang's email to Kiefers explains he

sent an email to Bloomberg which revealed that Surface had made a mistake. Surface

sent an email replying to Zhang and then met with Zhang and Heiland during which he

became mad for Zhang's email to Bloomberg. Kiefer testified that she reviewed the

emails exchanged between Zhang and Surface finding "no indication of racial

animus." ECF# 91-3, p. 23. Kiefer did not interview any third persons about this

incident.

        In an email dated December 4, 2018, to HR, Zhang provided more

information about Cathy Pecaro struggling with her project noting:

> Actually, Cathy started working on  . . . process since the beginning of 2016. It
> is still not done yet and doesn't meet expectation for sure. However, Michael
> [Surface] and Cathy find excuses to cover it up so that nobody notices she will
> miss her deadline soon. We know Cathy is Michael's favorite. Each person on
> my team doesn't feel comfortable to work with Cathy because if something
> goes wrong, the person on my team will be blamed by Michael for sure. I guess
> this issue (play favorites) is reflected in the MRA's engagement survey result.
> Feel free to interview any of my team members.

ECF# 91-3, p. 61. Zhang followed this with another email to HR dated December 12,

2018, providing more documentation:

> By the way, thanks HRI for providing the anti-harassment training. I learned so
> much from it. The third attachment includes a pushy email I received from
> Cathy Parcaro. It is a textbook example of microaggression. Also, it includes a
> potential weakness of Cathy's process I brought to her and Michael's attention
> long time ago. They just ignore it. So, it is a textbook example of bias.

ECF# 91-3, p. 63. The attached email from Parcaro reads, "Hi Josh—We will definitely

need some help from your team in order to compile this data—who from your team

should we work with?" ECF# 91-2, p. 64. Kieferbee testified that Parcaro's email was

not microaggression but was the type of communication they were encouraging in the workplace.

Surface testified that around this time period he noticed an "increasing[ly] unsettled disposition in" Zhang. ECF# 91-5, p. 14. He noticed in their daily meetings "a general aloofness" and "disengagement" in Zhang. ECF# 98-7, p. 23. Heiland avers that during this same period he "did not ever observe any insubordinate behavior by Zhang to his superior Surface, and actually observed the opposite where Zhang was very careful with his behavior toward Surface." ECF# 98-4, ¶ 19. Surface discussed Zhang's behavior with HR and forwarded to HR two email chains that included emails from Zhang to Surface.

One email chain looks to have been initiated by Heiland expressing concern and raising the possibility of an Operational Risk Event ("ORE") based on Pecaro's recent update on her project that included significant functionality problems in Heiland's opinion. Surface responded that Pecaro had been "struggling" with certain aspects but disagreed with the ORE concern. Zhang sent an email agreeing with Heiland that this was an ORE concern due to the delay potential, but he also suggested the operational risk group should be consulted. Surface replied questioning whether this was an ORE situation based on prior experiences but conceded he could be misunderstanding the situation as he had not yet done his ORE training. Zhang replied again noting that the operational risk group makes the final call. After a couple more short email exchanges, Surface sends an email on February 27 at 3:16 pm still stating that he saw the current situation differently but, "If you like, please work with Cathy, Ops Risk and others as needed to initiate the ORE and health status

review for the Poly project overall. Thanks again." ECF# 91-4, p. 95. Zhang

immediately replied, "I am not sure I or Craig is the right person to do it. We just

share some thoughts for management. We are glad that management is open to

listen. Thanks again." *Id.* Minutes later, Surface replied,

> Got it. I guess I'm not sure why you or Craig don't think you are the right ones
> to do this. You are both leaders in the MRA group and have a voice. I
> appreciate the feedback and yes, I'm open to listening to concerns or issues.
> But I also expect you to be empowered with the ability to make judgment calls
> as well even if everyone is not on the same page. Does that help?

ECF# 91-4, p. 94. Surface continued the email asking questions going to the

justification of ORE concerns and then said he would have Cathy pull together some

additional information. Zhang replied to Surface the next day in this way:

> I know Cathy is complaining she doesn't get much help from Amber or Stuart
>  . . . . However, I heard different story. Amber is complaining Cathy's
> management. Often times, Cathy complains how busy she is and could get
> much done . . . . Amber said she does offer helps. Amber is very talented.
> Unfortunately, Cathy doesn't want to lose her leverage and she is afraid of
> Amber's threat to her position. Cathy doesn't want Amber to touch . . .  Amber
> did talk to me to see whether she could move to my group.

*Id*.  Heiland then sent a lengthy email a couple hours later that was critical of

Pecaro's progress with the project and suggested Pecaro should file the ORE for the

reasons she has given. Early the next morning in an email to Surface and Heiland,

Zhang agreed with Heiland's earlier email and then contrasted how he and Heiland

were providing quality that made Surface "look good" while Pecaro's delays and

excuses with the project did not. He questioned Pecaro's understanding of the

process based on her delay and his interactions with her. He also questioned her

management ability based on complaints from her team members and from his

observations about her behavior. While both told Surface that an ORE based on

Pecaro's project was necessary and that Pecaro should prepare it, neither Zhang nor

Heiland worked with Pecaro to prepare an ORE.

The second email exchange shown to HR happened between Zhang and

Surface around the same time. Surface sent an email in the morning asking Zhang to

stop in. That afternoon, Zhang sent an email:

> Thanks for the update, Michael! I haven't got a promotion for several years
> since last one. Everyone could see what I did for MRA/the bank. Not matter is
> business knowledge, research/problem solving skills and management skill, I
> could compete with any other candidates including Krish. From working with
> him on validation, I could tell he doesn't know much about our business and
> why on any our modelling assumptions. Hopefully, he won't be another Frank.
> Probably, I have to teach him a lot to help him succeed. The other issue is that
> Theo may not like to report to him and will probably leave the bank soon. If
> Theo leaves, I will probably leave as well. Also, I don't know how long Krish
> could work for us and why he was let go (is in bottom 25% group). I could move
> to quant research function and Theo will continue to report to me. I think Theo
> will be ok with that change. Hajar and victor will report to Craig so that Craig
> could get a promotion as well. Everyone will be very happy. Let's talk about it
> when we can.

ECF# 91-4, p. 91. In sum, Zhang's email complained about Krish backfilling Schultz's

position on his team and suggested there could be some fall out **if** his team members

don't like working and reporting to Krish. Zhang avers that he shared his concern and

opposition to this hiring due to a conflict of interest because Krish was "a former

consultant FHLB had previously employed." ECF# 98-2, ¶ 53.

Kiefer in HR testified that Zhang was terminated on March 5, 2019,

because of the insubordinate behavior toward Surface observed in the above emails.

Kiefer said the emails show Zhang did not exercise his power of filing an ORE, denied

it was his job to file one, and continued to blame others for the problems. Kiefer also

interpreted Zhang's February 28th email as threatening Surface that he would leave if

Surface did not follow his recommendation. Kiefer opined that such behavior violated

the organization's value of accountability. Zhang avers that he is not aware of any non-Asian assistant vice president being terminated for disagreeing with a candidate selection or for advising a supervisor that employment opportunities elsewhere could be considered. ECF# 98-2, ¶¶ 53-54.

Zhang avers that following November 14, 2018, and up to his termination, Surface treated him differently including disregarding his "input regarding MRA Department issues and . . . [his] concerns about certain hiring decisions which could create a conflict of interest." ECF# 98-2, ¶ 33. Zhang further avers that, "[o]n March 5, 2019, FHLB terminated my employment for 'inconsistent communications.' At no time prior to my termination was I advised by any FHLB management personnel that I was not performing my work satisfactorily." ECF# 98-2, ¶ 51. Surface testified that following the November Verbal Counseling he was not involved in any verbal counseling or disciplining of Zhang, (ECF # 98-7, p. 90), and that he was not aware of any counseling done with Mr. Zhang for insubordination by himself or HR, *id*. at p. 16. Surface in his deposition explained that "there was some concern what if . . . [Zhang] left the bank, you know, we already were down, we were already short a person with Peg. You know, I just didn't think that we could survive in Josh's absence and I was very concerned about that." *Id*. at p. 17. Surface also testified that "over the years, . . . , [Zhang] had what I perceived and what he told me was that he had opportunities elsewhere, which for a high performer, you know, I was not surprised." *Id*. at p. 29. While Surface could not call specifically writing a memorandum to keep Zhang, Surface said he could presume "that it was probably something about wanting a promotion or a raise, so I probably had to go to

bat in that regard." *Id.* Zhang avers it was "common and encouraged practice in the MRA Department of FHLB for staff to seek external job opportunities and use the opportunity to leverage a promotion and/or establish their worth and value at FHLB." ECF# 98-2, ¶ 27.

In an email dated December 4, 2018, to HR, Zhang complained of Surface giving preferential treatment to Pacaro which made Zhang's team members uncomfortable about working with Pacaro because Surface would blame them if something went wrong. ECF# 91-3, p. 61. Zhang invited HR to interview his team. Kiefer in HR testified they did not investigate Zhang's claim about Surface's preferential treatment of Pacaro. Zhang and Hieland aver that "Surface historically [and] frequently blamed and demeaned Asian-minority members of the MRA Department for delays they did not cause and threatened termination of the Asian-minorities which he did not do to the non-minorities." ECF# 98-2, ¶ 52; ECF# 98-4, ¶ 40. FHLB Anti-Harassment and EEO Policy prohibits in part abusive, demeaning or derogatory comments and sets forth a philosophy of mutual respect.

During HR's review of documentation related to Zhang's EEOC claim, it discovered that Heiland had been sending a significant number of emails to an external email address, deleting his "sent" folder, then deleting his "deleted" folder. As this was being done outside of FHLB, Heiland was put on administrative leave starting April 12, 2019. Zhang avers he often worked remotely at home and developed spreadsheets at home for FHLB's use. Zhang also states that Surface knew of Zhang's practice and did not oppose it and that Zhang was never warned or disciplined for his practice being in violation of company policy. Heiland also avers that he emailed

FHLB work to his "personal email address to efficiently work remotely from home outside regular work hours or during vacation that typically involved very large spreadsheets and other documents and Surface was well aware of and did not oppose the practice." ECF# 98-4, ¶ 26. His affidavit also states he was not warned about or disciplined for this conduct being in violation of FHLB policy prior to his termination. *Id*. Heiland further avers that IT through Surface had cautioned him about copying personal flash drives at work but had never cautioned or disciplined him for sending work emails to his personal email address to work from home as he had done for years.

Surface conducted Heiland's annual performance review on April 3, 2019, making no complaints about his work performance and rewarding him an above average raise effective on April 1, 2019. Heiland avers that when Kiefer came for this unexpected meeting on April 12, 2019, to place him on administrative leave, he was in the middle of drafting an email notifying the MRA department that it had made a $12 million mistake. Heiland told Kiefer about this issue at the time. Kiefer asked no questions about this but told Heiland, "the bank will be okay." ECF# 98-4, ¶ 42. Heiland avers this "$12 million mistake ultimately impacted the Bank's quarterly publicly reported financial information that was in process of being compiled at that time and which needed to be corrected." *Id*.

HR's investigation into Zhang's emails included those sent to Heiland. Keifer testified this led HR into concluding that Zhang and Heiland:

> were engaged in a years' long campaign of rampant insubordination, absolute violations of our anti-harassment policy and engaged in stalker-like behavior of . . . female employees. And simply exchanged toxic discussions among

themselves about personal details of others' lives within our organization. So he [Heiland] was terminated.

ECF# 91-3, p. 39. Heiland avers that as directors in their department, he and Zhang "were responsible for monitoring all MRA staff's work performance, punctuality and attendance and . . . had been trained accordingly." ECF# 98-4, ¶ 4. Heiland avers he was terminated on April 29, 2019, "for alleged violation of multiple policies, but I was not informed of any specific policy violations." ECF# 98-4, ¶ 27.

Heiland never made a complaint to the FHFA Office of Inspector General until after his FHLB employment terminated. Heiland never completed an internal fraud complaint to FHLB. He also never made a complaint to the Chief Audit Executive or Chief Resources Officer or through the reporting system Ethics Point. Five months after his termination, Heiland filed two complaints with the Securities Exchange Commission ("SEC"), and his complaints concerned a methodology that began in 2001 about which he never filed a prior SEC complaint. The defendant does not cite evidence of record that supports the wording of its statements of fact at ¶¶ 98 and 99.

Zhang made no complaints to the FHFA, FHFA OIC, or SEC until after his termination. The defendant cites testimony from Zhang about exchanging emails several years back with the chief risk officer over the issues of valuation but he "did not say fraud explicitly." ECF# 91-4, p. 52. Zhang avers reporting to management his concerns with false and inaccurate financial reports and results in 2018 and 2019 and even complained to Surface that Parcaro's "income simulation validation was fraudulent." ECF# 98-2, ¶ 43. He also avers that during his employment he "reported wrongdoing by FHLB personnel through the intervention of higher authorities inside

the company, including FVP Michael Surface, CEO Mark Yardley, HR Director Amanda Kiefer and Corporate Counsel Sarah Morse." ECF# 98-2, ¶ 60.

The defendant's statement of fact at ¶ 104 that the plaintiffs' FHFA "cases" were closed with the FHFA "finding the allegations were 'disproven or unsubstantiated,'" is not supported by the cited evidence. Had the defendant stated that one case was closed with the stated result of, "Referred or Outside Investigative Jurisdiction," along with an explanation, and one case was closed with the stated result of "Allegation(s) Disproven or Unsubstantiated," then the court would have found the statement to be uncontroverted. ECF# 91-2, pp. 183-184. The defendant's reply rightly points out that the deposition exhibit speaks for itself, and so the exhibit should be rightly described in any statement of fact. ECF# 99, p. 40. Nor does the court accept the defendant's statement of fact at ¶ 105 as uncontroverted. Interpreting Zhang's testimony during this argumentative line of questioning does not fall within the proper scope of a summary judgment proceeding.

Both plaintiffs aver that they reported concerns over what they regarded as wrongfully false or improper financial reporting to senior management and that they considered these reported concerns to be potential violations "of the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7201 *et al.*), FHLB's Anti-Fraud Policy and the Safety & Soundness Act (12 U.S.C. § 4501 *et seq.*) governing the Prudent Management and Operation Standards for the FHLB." ECF## 98-2, ¶¶ 49-50; 98-4, ¶¶ 29-30. Zhang and Heiland both aver individually that FHLB did not "address with me any of the reported concerns about false reporting about which I complained." ECF## 98-2, ¶ 47; 98-4, ¶ 28.

Both plaintiffs also aver that Heiland observed Surface's discriminatory treatment of Asian-minorities and openly opposed it and took action to minimize historical and future bias at FHLB. ECF## 98-2, ¶ 52; 98-4, ¶ 40. Zhang avers that on April 3, 2019, he "provided FHLB with emails which included Heiland's knowledge of and opposition to race discrimination in the MRA Department and false financial reporting in violation of FHLB's Anti-Fraud Policy and the Safety and Soundness Act." ECF# 98-2, ¶ 57. Heiland's affidavit states he was referred to as "Mother Hen" for openly opposing discrimination and bias against the Asian minorities within the MRA Department. ECF# 98-4, ¶ 41. He also avers that he received an anonymous lunch basket gift of a rice bowl and chopsticks which he considered to be an act of bias against which he opposed.

Heiland's affidavit includes these two statements on his financial reporting: "On April 11, 2019, I reported a serious issue to Surface regarding pricing mortgage investments which I considered to be consistent with FHLB's Anti-Fraud Policy and to potentially violate the Safety and Soundness Act." "More specifically, on April 11, 2019, at 5:16 p.m., I reported to Surface a serious ongoing methodology issue that was escalating to very alarming levels in pricing and valuing new mortgage investments." ECF# 98-4, ¶¶ 23-24. He also avers that during his employment he "reported wrongdoing by FHLB personnel through the intervention of higher authorities inside company including FVVP Michael Surface, HR and Legal." *Id*. at ¶ 35.

It is uncontroverted that FHLB offered severance packages to both Zhang and Heiland on the dates of their terminations and that both packages offered 6

months' severance pay rather than the 3 months specified in FHLB's severance policy. The plaintiffs also point that FHLB's severance policy provides that a business partner is ineligible for severance pay when the partner is terminated for misconduct.

## SHAM AFFIDAVITS

FHLB in its reply brief repeatedly objects to the plaintiffs' summary judgment affidavits as improper sham affidavits. FHLB, however, does not support its repeated objections with specific citations to deposition testimony directly contradicted by the affidavits. "[A]n affidavit will be considered a sham only if it contradicts the affiant's prior sworn testimony." *Middleton-Thomas v. Piat, Inc.*, 323 F. Supp. 3d 1218, 1239 n.12 (D. Kan. 2018) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)); *see Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n. 3 (10th Cir. 2014) ("Sham affidavits, though 'unusual,' arise when a witness submits an affidavit that contradicts the witness's prior testimony."). As in *Middleton-Thomas*, the defendant here has not shown the court where and how the plaintiffs' affidavits contradict their deposition testimony.  FHLB accuses the plaintiffs of using their affidavits to manufacture disputes, but it fails to cite deposition testimony that is specifically and directly contradicted by the plaintiffs' averments. The defendant faults the plaintiffs for not raising the contents of their affidavits during their depositions, but it fails to cite in the deposition when the plaintiffs were asked to provide this content or even when they should have provided this content. Short of a direct conflict between the affidavit and the deposition, there is no need to address the other factors for deciding whether the plaintiffs were attempting to create a sham fact issue. The defendant complains about the

conclusory statements found in the plaintiffs' affidavits. Such statements do not necessarily create a sham dispute. Nor does raising a "sham affidavit" objection open the door to general credibility attacks at summary judgment. The defendant's sham affidavit objections are overruled.

**GOVERNING LAW**

Under Title VII, it is unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To survive summary judgment on a Title VII claim of discrimination based on race, color, religion, sex, or national origin, a plaintiff must present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). Having no direct evidence of discrimination, a plaintiff must follow the *McDonnell Douglas* framework. This means the "plaintiff must first raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations." *Bekkem*, 915 F.3d at 1267 (internal quotation marks and citation omitted). "The burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* "If the employer does so, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.*

At this last stage, the court is to "consider the evidence of pretext in its totality."

*Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 884 (10th Cir. 2018).

**ANALYSIS**

Zhang's Title VII Discrimination Claim

FHLB seeks summary judgment on several grounds. On his prima facie case, Zhang cannot prove he was doing satisfactory work and was treated less favorably than others of a non-protected class. Zhang also cannot prove FHLB's articulated reason for terminating him is pretextual. Zhang directly responds pointing to the evidence of record which creates genuine issues of material fact as to each contention. Thus, the court understands that Zhang's Title VII discrimination claim alleges termination as the only adverse employment action taken for which relief is sought. This determination is critical as it impacts the operative elements of a prima facie case of discrimination.

The plaintiff bears the burden of making a prima facie case of discrimination which "must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007); *see Bennett v. Windstream Communications, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). "While the elements of a prima face case 'are neither rigid nor mechanistic, their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor.'" *Bennett*, 792 F.3d at 1266 (quoting *Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1146

(10th Cir. 2008)). The burden of making a prima facie case "is not onerous," "is one of production, not persuasion," and "involve[s] no credibility assessment." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (internal quotation marks and citations omitted). While the prima facie case serves primarily to eliminate "the most common nondiscriminatory reasons" for the adverse employment action, it still must function as a critical inquiry into "whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Plotke*, 405 F.3d at 1099-1100 (internal quotation marks and citations omitted). Possible circumstances could include:

> actions or remarks by decisionmakers that could be viewed as reflecting a discriminatory animus, . . ., preferential treatment given to employees outside the protected class . . . .  A plaintiff might also rely . . . upon the timing or sequence of events leading to plaintiff's termination.

*Id*. at 1101. In the "canonical case" of a plaintiff employee's discharge, the Tenth Circuit has held the plaintiff must show the following for a prima facie case:  "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) (internal quotation marks and citation omitted).

FHLB uses a prima facie case which would require the plaintiff to prove that he was performing "satisfactory" work and that he was treated "less favorably" than other FHLB employees outside his protected group. The court accepts there is case law within this district and circuit supporting FHLB's elements. The court, however, believes the Tenth Circuit is most consistent in recognizing that a prima facie case varies with context and that in the "canonical case" of an employee's

discharge, then the prima facie case in *Singh*, 936 F.3d at 1037, applies. Otherwise, an employer would be able to insert its grounds of termination (insubordination) into the prima facie case and require the plaintiff to disprove them. FHLB does not cite a case in which the plaintiff had to show he was not insubordinate for his prima face case. A quick review of Tenth Circuit decisions show that insubordination is evaluated as the employer's non-discriminatory business reason at the second and third stages of the *McDonnell Douglas* analysis. *See, e.g. Young v. City of Idabel*, 721 Fed. Appx. 789, 795-96 (10th Cir. Jan. 26, 2018); *Jaramillo v. Adams County School Dist. 14,* 680 F.3d 1267, 1269 (10th Cir. 2012); *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 483 (10th Cir. 2006), *cert. dismissed*, 549 U.S. 1334 (2007); *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1410 (10th Cir. 1984). This court in 2011 rejected an employer's effort to have its business reasons considered at the prima facie stage:

> The defendant argues the plaintiff cannot prove this element based upon her unsatisfactory job evaluations, her recent placement on a performance improvement plan, employment history replete with numerous disciplinary incidents and prior terminations, and her persistent problems with attendance, insubordination and failure to discipline employees. The plaintiff points to the fact that she had been employed there for more than thirty years, her own opinion of her work performance, and the extended supervisory responsibilities she held. As for the defendant's opinion about her job performance, the plaintiff contends this should not be considered at the prima facie stage.
>
> The Tenth Circuit has "held that a defendant cannot defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment action because the plaintiff in such a situation would be denied the opportunity to show that the reasons advanced by the defendant were pretextual." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000) (citing *MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119-20 (10th Cir. 1991)). "[A] plaintiff is only required to raise an inference of discrimination, not dispel the nondiscriminatory reasons subsequently proffered by the defendant." *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). "A defendant's evidence regarding an employee's work performance should not be considered when determining whether the employee has made a

prima facie case of employment discrimination." *Ellison v. Sandia Nat'l.*
*Laboratories*, 60 Fed. Appx. 203, 205, 2003 WL 714849 at *2 (10th Cir.) (citing
in part *MacDonald*, 941 F.2d at 1119–20 and *Horizon/CMS Healthcare Corp.*,
220 F.3d at 1192–93), *cert. denied*, 540 U.S. 880 (2003). "In analyzing Plaintiff's
prima facie case, it is important not to conflate their claim of discrimination
with Defendants' proffered explanation." *Orr*, 417 F.3d at 1149 (citation
omitted). The Tenth Circuit has held in such circumstances:

> that a plaintiff may meet the second element of "a prima facie case of
> discrimination in a discharge case by credible evidence that she
> continued to possess the objective qualifications she held when she was
> hired, or by her own testimony that her work was satisfactory, even
> when disputed by her employer, or by evidence that she held her
> position for a significant period of time."

*Bolton v. Sprint/United Management Co.*, 220 Fed. Appx. 761, 767, 2007 WL
666339 at *4 (10th Cir.2007) (quoting *MacDonald*, 941 F.2d at 1121 (citations
omitted)); *see Bowdish v. Federal Express Corp.*, 699 F.Supp.2d 1306, 1317–18
(W.D.Okla.2010).

*Bullard v. Goodyear Tire and Rubber Co.*, 09-4024-SAC, 2011 WL 4092192, at *13–*14

(D. Kan. Sept. 14, 2011). As for the defendant's argued fourth element of showing the

plaintiff received less favorable disciplinary treatment than non-minority employees,

the court will not add that element in an employment discharge prima facie case

consistent with the Tenth Circuit's decision in *Kendrick v. Penske Transp. Services,

Inc.*, 220 F.3d 1220, 1228-29 (10th Cir. 2000). *See Bronakowski v. Boulder Valley

School Dist.*, 549 F.Supp.2d 1269, 1279 (D. Colo. 2008), *aff'd*, 294 Fed. Appx. 408

(10th Cir. Sep. 24, 2008), *cert. denied*, 555 U.S. 1193 (2009).

      The court is satisfied from the summary judgment record that the

plaintiff Zhang has made this simple prima facie case which eliminates the most

common reasons for a non-discriminatory discharge and gives rise to a simple

inference of discrimination. The evidence shows that Zhang continued to possess the

objective qualifications and that he objectively continued to perform at an

acceptable level, if not higher. Based on Zhang's twelve years of working at FHLB and

his own testimony about his performance, the plaintiff has satisfied this element of

his prima facie case. Zhang argues even more circumstances supporting an inference

of discrimination which the court will address at the third stage. The balance of

FHLB's arguments on this discrimination claim fall within its non-discriminatory

business reasons for the termination and the plaintiff's efforts at proving pretext. *See*

*Orr v. City of Albuqueque*, 417 F.3d at 1149.

The burden of production now shifts to FHLB to articulate a

legitimate, nondiscriminatory or nonretaliatory reason for its actions. *Bennett v.*

*Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). Zhang does not

contest that FHLB has come forward with its non-discriminatory reasons. Now the

burden shifts back to the plaintiff "to show that the defendant's explanation was

merely pretextual." *Id*. The court is mindful that "'a plaintiff's prima facie case,

combined with sufficient evidence to find that the employer's asserted justification is

false, may permit the trier of fact, to conclude that the employer unlawfully

discriminated.'" *Id*. (quoting *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133,

148 (2000)). The plaintiff's burden at this stage has been summarized in this way:

> A plaintiff can meet this burden to show pretext in either of two ways:  (1) by
> showing that the proffered reason is factually false or (2) by showing that
> discrimination was a primary factor in the employer's decision, which is often
> by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or
> contradictions in the employer's proffered reason[]," such that a reasonable
> fact finder could deem the employer's reason "unworthy of credence."

*Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (quoting *Garrett v. Hewlett-*

*Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)). "'[T]he evidence which a plaintiff

can present in an attempt to establish that a defendant's stated reasons are

pretextual may take a variety of forms,' and '[a] plaintiff may not be forced to pursue

any particular means of demonstrating that a defendant's stated reasons are pretextual.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) (quoting *Kendrick*, 220 F.3d at 1230). But, "[m]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Bekkem*, 915 F.3d at 1268 (internal quotation marks and citation omitted). Pretext is evaluated not by looking "at each piece of evidence in isolation," but by considering "the plaintiff's evidence 'in its totality." *Id.* at 1270 (quoting *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008)). At the same time, the court evaluates evidence of pretext within this framework:

> Although we may consider all of the foregoing matters, "[w]e may not second guess the business judgment of the employer." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quotations omitted). Evidence that the employer "should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision," and "do not look to the plaintiff's subjective evaluation of the situation." *C.R. England*, 644 F.3d at 1044 (citations and quotations omitted). Instead of asking whether the employer's reasons "were wise, fair or correct," the relevant inquiry is whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." *Swackhammer*, 493 F.3d at 1170 (quotations omitted).

*DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970-71 (10th Cir. 2017).

FHLB's argued reason for terminating Zhang is that he was not performing satisfactorily following his Verbal Counseling, as he became increasingly aloof, insubordinate, and critical of management. From the court's discussion above on the parties' statements of fact, it should be quite clear that there are genuine issues of material fact precluding summary judgment on pretext. Rather than repeating each of those issues here, the court summarizes some of those argued in

the parties' summary judgment memoranda. Zhang's opening point is that FHLB
modified its reason for his termination from what it told him at the time,
"inconsistent communications," to now defending that it was insubordinate behavior.
Adding to the implausibility and incoherency of this reason, Zhang notes that neither
Surface nor HR counseled, warned, or disciplined him about any such behavior before
his termination. Zhang argues the treatment of him contradicts FHLB's promotion of
itself as an employer practicing mutual respect in the workplace and for having a
detailed and elaborate process for workplace discipline. There is also the arguable
inconsistency in terminating an employee with Zhang's lengthy tenure and high-
performance level for this kind of behavior without warning.

        FHLB's evidence of record does not show Zhang's purported behavior to
be so insubordinate and disruptive of the workplace that a reasonable jury could not
deem FHLB's reason as unworthy of credibility. FHLB primarily relies on two email
chains between Surface and Zhang as the supporting evidence of insubordinate
behavior. From its review of them, the court is not convinced they possess the quality
and clarity of evidence needed to sustain summary judgment at the pretext stage.
Nor will the court assume the role of factfinder to read the emails as FHLB advocates.
The emails in question do not plainly show, without other plausible readings, that
Zhang wrongly refused to exercise his authority to file an ORE under the
circumstances and that Zhang wrongly threatened to leave if Surface did not follow
his hiring recommendation. From the face of the emails, they can reasonably be read
as firmly worded rather than insubordinate. From Zhang's other evidence, the
matters raised in them can reasonably be understood as deserving his attention based

on history and training. He also avers that non-Asian American vice presidents were not terminated for expressing disagreement with supervisors over the selection of a certain candidate for valid reasons or for advising a supervisor that other employment opportunities were being considered under the circumstances. And then there is the inconsistency of this being interpreted as an insubordinate threat justifying termination when Surface testified that he very well could have written a past memorandum in support of Zhang receiving a promotion or raise after being told that other employment opportunities existed for Zhang.

Zhang was openly critical of the verbal counseling as unfair and discriminatory, and he thereafter asked for his team members to be interviewed regarding his complaints about the discriminatory behavior by Schultz and Surface. The defendant took no steps to assure Zhang that these interviews or any related investigation was occurring. As Zhang avers, following these complaints, Surface increased his scrutiny of Zhang, disregarded Zhang's input on department issues, and disregarded Zhang's expressed concerns over hiring decisions. There is also evidence that Zhang complained about Surface's preferential treatment of Pacaro in December of 2018, who was the subject of the other email chain, and that HR never investigated his claim before his termination. Instead, HR relied on Surface's presentation and interpretation of the email chains and communications with Zhang. Both Zhang and Heiland also averred about Surface historically blaming and demeaning Asian-minority members of the department for delays they did not cause and even threatening their termination unlike his handling of other non-minority employees. Finally, Zhang points to FHLB's severance policy under which he would have been ineligible for severance

benefits if terminated for FHLB's stated reasons. And yet, FHLB did offer him a severance package. Considering Zhang's evidence in its totality, the court concludes there is enough evidence here for a reasonable jury to find FHLB's primary factor for terminating Zhang was discrimination and/or retaliation for complaining about discrimination.

<u>Zhang's and Heiland's Title VII Retaliation Claim</u>

For a Title VII prima facie case of retaliation, the plaintiffs "must show (1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193). FHLB argues that Heiland cannot prove the first element of protected activity and that both plaintiffs cannot prove the third element of a causal connection.

According to FHLB, Heiland never complained about or filed any report of discrimination against Zhang or any other minority employees within the department. FHLB further denies that Heiland's asserted activities amount to protected activity or consist of something more than active, consistent behavior in ordinary discourse.

Title VII makes it an unlawful employment practice to discriminate against an employee "because he has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). The Tenth Circuit has summarized:

> The Supreme Court has defined "oppose" in this context by looking to its ordinary meaning: "to resist or antagonize; to contend against; to confront; resist; withstand, ... to be hostile or adverse to, as in opinion." *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276, 129 S.Ct. 846,

172 L.Ed.2d 650 (2009) (citations and ellipsis omitted). Under this broad definition, "[w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Id.* (quotation marks, ellipsis, emphasis, and citation omitted); *see also Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors.").

*Hansen v. SkyWest Airlines*, 844 F.3d 914, 925–26 (10th Cir. 2016). The Supreme Court

in *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*,

555 U.S. 271, 277-78 (2009), also said,

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. . . . There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.

555 U.S. at 277–78. Courts have held that, "simply being listed as a witness on an

internal complaint form, without actively volunteering to serve as a witness or

offering some indication of the nature of the proposed testimony does not constitute

'opposition under Title VII." *Thampi v. Manatee County Board of Com'rs*, 384 Fed.

Appx. 983, 990 (11th Cir. 2010), *cert. denied*, 562 U.S. 1219 (2011); *see Wimbley v.*

*Doyon Security Services, LLC*, 2014 WL 4376148, at *6-*8 (S.D. Fla. Sep. 4, 2014)(Not

protected activity to be listed as a witness willing to testify as truthfully and neutrally

in a co-employee's case, the plaintiff must allege he would have opposed the

defendant's unlawful practice and his opinion must have been disclosed to the

defendant.)

34

The affidavits of Heiland and Zhang are sufficient to establish the first element of the prima facie case, and FHLB has not shown these averments to conflict with their deposition testimony. On April 3, 2019, following his termination, Zhang provided emails to FHLB in support of his allegations of discrimination and retaliation. ECF# 91-3, pp. 71-74. These emails reference Heiland's knowledge and opposition to race discrimination in the MRA Department as both a witness and email participant. This happened after Heiland had complained to Surface on the day of Zhang's termination, March 5, 2019, that the termination was discriminatory and retaliatory. Heiland further avers that on April 12, 2109, when he was placed on administrative leave, he told FHLB's HR and Legal Departments that he opposed the discrimination and retaliation against Zhang. The range of protected opposition includes "voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) (citation omitted). "[N]o magic words are required" to constitute protected activity so long as the employee conveys to the employer a "concern that the employer has engaged in a" practice that is unlawful. *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Heiland further avers he was given a workplace nickname and an anonymous gift intended to mock him for supporting the Asian minorities in this department. At this juncture, the court cannot rule out that Heiland engaged in protected opposition, when considered together, by being known for opposing Asian discrimination, by openly opposing Zhang's termination as discriminatory to superiors and management, and then by letting himself be mentioned as a witness of Zhang's discrimination. The court is satisfied this is enough to meet the first element of the prima facie case.

FHLB next contends neither plaintiff can prove the third element of a causal nexus between their protected activity and terminations. Against Zhang, FHLB emphasizes that he admitted making his discriminatory allegations in response to Schultz's complaint against him, that it investigated his allegations made in his response to the Verbal Counseling, and that he was terminated four months later for reasons unrelated to his complaint. Because this four-month gap does not create a rebuttable inference of retaliatory intent, Zhang must come forward with more evidence of record. FHLB argues Zhang has none. Against Heiland, FHLB also denies any temporal proximity between his participation and his termination in April of 2019.

Zhang denies FHLB's credibility attack that he only voiced concerns over Asian discrimination after Schultz alleged he sexually discriminated against her. His affidavit refers to prior instances when he complained to Surface about Schultz's rude treatment of Asian employees and complained to Surface for not promoting the Asian employees on his team. As the statement of facts shows, in a written document dated November 20, 2018, Zhang responded to his Verbal Counseling addressing not only Schultz's allegations and discriminatory behavior but also FHLB's handling of her complaint and its discipline of him as discriminatory. ECF# 91-4, pp. 70-74. Despite his tenure and position, he was never interviewed about Schultz's allegations before the Verbal Counseling. Zhang also complained to Surface that the Verbal Counseling was race discrimination against him, as shown by his prior assertions of race discrimination were ignored but an allegation from a single white female employee was handled so differently. Zhang emphasizes that FHLB's investigation of Schultz's allegations involved interviewing only two white female employees without

interviewing, as he requested, the employees who would have been witnesses to any such discrimination, including the Asian employees working in the same department who were treated discriminatorily by Schultz.

Zhang notes his protected activity extends beyond his written defense to the Verbal Counseling. At the end of November of 2018, Zhang complained to HR about Surface discriminating against him. In December of 2018, Zhang complained to HR about Surface favoring Pecaro, a white woman, over his Asian team members. As Zhang avers, after these allegations of discrimination, Surface increased scrutiny of Zhang, disregarded Zhang's input on department issues, and disregarded his concerns over hiring decisions that created a conflict of interest. Surface went to HR stating that Zhang's conduct was becoming aloof and disengaged, and yet, he never counseled or disciplined Zhang about such conduct. Zhang continued to send emails critical of Pecaro's recent work and critical of Surface's recent hiring decision despite Zhang's expressed concerns. Instead of discussing these emails further with Zhang, Surface took them to HR, and Zhang was terminated less than a week later.

Heiland points to the close temporal proximity between his protected activity on March 5 and April 12 opposing racial discrimination in Zhang's termination and his own termination on April 29. He also points to Zhang's communications on April 3 and 11 identifying him as a witness and opponent of racial discrimination.

To show a causal connection, the plaintiffs "must present 'evidence of circumstances that justify an inference of retaliatory motive.'" *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)). Courts may "infer retaliatory motive from a close

temporal proximity between an employee's protected conduct and an employer's adverse employment action." *Hinds v. Sprint/United Mgt. Co.*, 523 F.3d 1187, 1204 (10th Cir. 2008). On what is a close temporal proximity, the Tenth Circuit has said that, "unless the termination is very close in time indeed to the protected activity," the plaintiff must have more evidence to establish causation, and that "a one-and-a-half-month period may suffice to establish causation on a prima facie basis, but a three-month period, standing alone, will not suffice." *Id.* (citing in part *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). "Thus, where a gap of three months or longer has occurred, a plaintiff must present other evidence—more than mere speculation, conjecture, or surmise—to establish that her protected activity was a but-for cause of the adverse employment action." *Bekkem*, 915 F.3d at 1271 (internal quotation marks and citations omitted).

For both plaintiffs, some of their protected activities occurred within three months of their terminations as to satisfy this element. The court is also satisfied that the plaintiffs have forward with additional evidence in combination with the temporal proximity from which a reasonable jury could infer a retaliatory motive. For the reasons stated earlier, the court here too concludes there is enough evidence here for a reasonable jury to find FHLB's stated reasons for terminating Zhang were a pretext for retaliating against him. The court will not address this third-stage question as to the plaintiff Heiland, because FHLB's original brief did not advance any substantial argument on it.

State-Law Claim of Retaliatory Discharge for Whistle-Blowing Activities

FHLB seeks summary judgment arguing the plaintiffs cannot make a prima facie case. The plaintiffs' complaints to reporting bodies occurred after their terminations and, therefore, the FLHB did not know of any reporting activity or the likelihood of the same prior to their termination. As for what the plaintiffs may have told company management before their terminations, the plaintiffs have not identified any specific laws, rules or regulations they reported as having been violated. Their complaints over the delay in implementing a modeling program are no more than opinions or beliefs which are not entitled to common law protection. Lastly, FHLB challenges the plaintiffs' ability to prove good faith in complaining about the delay, because Surface encouraged them to report this by filing an Operational Risk Event ("ORE") which they chose not to do.

As reflected in the pretrial order, Zhang claims he was terminated in retaliation for reporting violations of the Anti-Fraud Policy, the Safety and Soundness Act, and Sarbanes-Oxley Act. Specifically, Zhang alleges that he told Surface in December of 2018 of "a modeling issue that would generate false reports" and that he also told Enterprise Risk Management ("ERM") Department of "suspicious model validation reports." ECF# 89, p. 4. He avers having complained to Surface, HR and the Legal Department that "modeling issues with Cathy Parcaro's work . . . would generate false reports in violation of FHLB policies and the Safety and Soundness Act." ECF# 98-2, ¶ 40. He also avers reporting to ERM that Parcaro's reports "for model validation didn't make sense and are very suspicious" and "potentially violated the Safety and Soundness Act." ECF# 98-2, ¶ 41. Zhang also alleges that in January of 2019 he reported to Surface "a serious modeling issue in the stress-testing process,"

and that in March of 2019 he reported to Surface and Schlossman "serious concerns about the PolyPath income simulation validation process." ECF# 89, p. 4. Zhang further avers that in January he protested the Bank's stress testing process "led to significant inaccuracy in the reports submitted to FHFA and disclosed to public." ECF# 98-2, ¶. 42. Finally, he avers that he pointed out on March 1, 2019, that "Parcaro's PolyPath income simulation validation was fraudulent" and had not been "implemented" as planned and so "should be reported as an ORE according to operation risk management procedures." ECF# 998-2, ¶ 43.

Heiland's alleged and averred whistle-blowing activities are that he and Zhang protested to Surface about significant inaccuracies in the Bank's stress testing process on January 9, 2019, that he and Zhang on March 1, 2019, complained to Surface that Parcaro's PolyPath income simulation validation was fraudulent and should be reported according to operation risk management procedures process, and that on April 11, 2019, he reported to Surface serious ongoing methodology issues with pricing mortgage investments in potential violation of the Safety and Soundness Act.

In the absence of direct evidence, to establish a retaliatory discharge claim under the whistleblower exception to the at-will employment doctrine, the plaintiff employee must make first a prima face by clear and convincing evidence that:

> "1) a reasonably prudent person would have concluded that the employer or a coworker was engaged in activities that violated rules, regulations, or the law pertaining to public health and safety and the general welfare; (2) the employer had knowledge that the employee had knowledge that the employee reported the violation prior to his or her discharge; and (3) the employee was discharged in retaliation for making the report."

*Lykins v. CertainTeed Corp.*, 555 Fed. Appx. 791, 794 (10th Cir. Feb. 12, 2014) (quoting *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 42 Kan.App.2d 994, 219 P.3d 857, 862 (2009)(citing *Goodman v. Wesley Med. Ctr., L.L.C.*, 276 Kan. 586, 78 P.3d 817, 821 (2003)), *rev. denied*, 291 Kan. 913 (Oct. 7, 2010)). "'Proximity in time between the claim and discharge is a typical beginning point for proof of causal connection.'" *Bergersen v. Shelter Mut. Ins. Co.*, 229 Fed. Appx. 750, 753–54 (10th Cir. 2007) (quoting *Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546, 35 P.3d 892, 899 (2001)).

"The employer must know of the employee's reporting such violation before termination and must have made the termination decision in retaliation for the report." *DeHart v. Bd. of County Commissioners of Riley County, Kansas*, 463 F. Supp. 3d 1219, 1233 (D. Kan. 2020) (citation omitted). Contrary to the defendant's motion, this does not appear to be an issue as the plaintiffs' claims are not for complaining to outside reporting bodies after their terminations but for reporting concerns and potential violations with company management prior to their terminations. "[I]nternal whistleblowing is recognized as an actionable tort in Kansas at least in some instances." *Shaw*, 42 Kan. App. 2d at 1000. To be actionable, the reporting activity must seek "to stop unlawful conduct pertaining to public health and safety and the general welfare by a coworker or an employer through the intervention of a higher authority inside the company." *Id*. at 1002. At the summary judgment stage, absent evidence that establishes a reasonably prudent person would not think the reported activity is a safety hazard, *i.e.* a violation, the court is to resolve the facts and

inferences in favor of the plaintiff by accepting his testimony that it was a safety hazard for purposes of the motion. *Id*. at 1003.

FHLB does not cite case law supporting its proposition that the plaintiffs' burden includes identifying specific provisions of law or regulation which FHLB allegedly violated and which they reported to management prior to terminations. FHLB says its not enough for the plaintiffs to point generally to the Safety and Soundness Act, FHFA regulations and Sarbanes-Oxley Act as possible violations based on what they reported to Surface and others. The plaintiffs counter that their complaints over the modeling issues were that the generated reports would be false, very suspicious, and significantly inaccurate. These reports were to be generated, relied upon, and given to other federal entities and then would become public information.

The plaintiffs position their reporting of these concerns to upper management as consistent with FHLB's own Anti-Fraud Policy. They also put forward that such false reporting would violate the Sarbanes-Oxley Act and the Safety and Soundness Act which govern FHLB's prudent management and operation standards. It is uncontroverted that FHLB is highly regulated and subject to extensive oversight from auditors and other governmental bodies. The court fails to find any dispute over the general notions that FHLB engaging in or allowing false financial reporting would not only contradict its operational standards but would trigger requirements for it to be reported, and both of which directly impact FHLB's role as a federally chartered corporation providing reliable liquidity and funding to its members. Certainly, these are matters implicating the general welfare as to fall within public policy. This case

does not resemble *Goodman* where the public policy lacked a clear mandate and was too indefinite for a reasonably prudent person to conclude that the employer was engaged in activities that violated public policy. 276 Kan. at 592-93. Instead, this case resembles *Shaw* where the law and regulations are clear and fixed, and the plaintiffs personally observed matters within the scope of their knowledge that lead them to report their conclusions about significant errors happening that would result or have resulted in false reports. 42 Kan. App. 2d at 1003-1004. The court also rejects the defendant's summary judgment argument that it is uncontroverted the plaintiffs were merely reporting their personal opinions about FHLB's operating practices. The plaintiff's testimony and averments over what they reported show them to be more than subjective feelings or opinions over how FHLB should operate.

Finally, the court does not find the plaintiffs' good faith to be an issue appropriate for summary judgment. Kansas law requires the plaintiff employee to "prove that any whistleblowing was done in good faith based on a concern regarding the wrongful activity reported rather than for a corrupt motive like malice, spite, jealousy, or personal gain." *Goodman*, 276 Kan. at 590 (citation omitted). The record is replete with evidence of past emails and efforts by the plaintiffs to insure their department yielded accurate and reliable financial reporting results. The plaintiffs also have evidence of their good faith in reporting these most recent concerns. Consequently, the emails exchanged between Surface and the plaintiffs over the OREs and the subsequent agency findings do not show that the plaintiffs are unable to prove good faith. The inferences argued by FHLB do not overwhelm the plaintiffs' averments of good faith or the other inferences that could be drawn from these same

circumstances. Viewing the evidence in the light most favorable to plaintiffs, a jury could reasonably conclude that they reported their concerns in good faith.

In sum, the defendant's arguments and cited facts do not persuade the court that the plaintiffs are unable to present prima facie cases of retaliatory discharge under Kansas law.

IT IS THEREFORE ORDERED that the defendant FHLB's motion for summary judgment (ECF# 90) is denied.

Dated this 28th day of April, 2021, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge